**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 23-cv-61078-ALTMAN/Strauss**

COLLISION CARE XPRESS
MCNAB, LLC,

      *Plaintiff*,

v.

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY,

      *Defendant*.

_____/

## ORDER

An automobile repair shop sued an insurance company for tortious interference. The insurance company now moves for summary judgment. After careful review, we **GRANT in part** and **DENY in part** the motion for summary judgment.

### THE FACTS

The Defendant—State Farm Mutual Automobile Insurance Company ("State Farm")—"is an automobile insurance company providing policies of insurance to its insureds." Motion for Summary Judgment (the "MSJ") [ECF No. 67] at 1. "State Farm's insurance policies with its insureds require State Farm to pay for covered claims in accordance with the terms of the policies." Defendant's Statement of Undisputed Material Facts (the "SUMF") [ECF No. 69] at 1. "State Farm has agreements with certain repair facilities State Farm calls 'Select Service' facilities," and those facilities "contractually agree with State Farm to the amount of money State Farm is willing to pay for [a] repair, plus the insured's deductible." *Ibid.* "If an insured or a claimant elects to have his/her vehicle repaired by a Select Service facility, the insured/claimant will not be personally liable for any costs, sometimes called

'out of pocket expenses.'" *Id.* at 2. But "[n]on-Select Service facilities may charge their customers expenses beyond those State Farm is obligated to pay under its insurance policies[.]" *Ibid.*

Our Plaintiff—Collision Care Express McNab, LLC ("CCX")—"is an automobile repair shop [that] provides services to the public for automobile repairs from car collisions and other car crashes." Amended Complaint ("AC") [ECF No. 20] at 2. "For a period of time prior to September 8, 2020, [the] Plaintiff was a 'Select Service' repair facility with State Farm pursuant to a written agreement." Joint Statement of Undisputed Facts (the "Joint Statement") [ECF No. 68] at 1. But, on "September 8, 2020[,] State Farm terminated its written agreement with Plaintiff, with the termination becoming effective on September 9, 2020." *Ibid.* "After the termination of . . . [the] written agreement, [the] Plaintiff continued to provide vehicle repair services to . . . customers . . . insured by State Farm." *Id.* at 2. As relevant here, three such customers—Christine Kolenda, Edward Kon, and Joshua Cohen— each filed "an insurance claim with State Farm" to repair "damage[d]" vehicles. *Ibid.* Those customers initially took their cars to the Plaintiff "in connection with [their] claim[s]," but they "subsequently transferred to [a Select Service] facility not owned by Plaintiff." *Ibid.*

The parties explain those transfers differently. The Defendant says that the customers made the switch "to avoid the possibility of out of pocket costs." *Id.* at 5. The Plaintiff claims that the Defendant "caused the removal[s]" by making "misrepresentation[s] about CCX rates." Plaintiff's Statement of Disputed and Undisputed Facts (the "SDUF") [ECF No. 76] at 5; *see also* AC ¶ 39 ("Cohen was told by a State Farm adjuster that the Plaintiff 'can't accept the vehicle' and he was told by the tow truck driver employed by State Farm that the Plaintiff was 'holding the vehicle hostage.'" (cleaned up)); *id.* ¶ 41 (alleging that the Defendant made "disparaging remarks . . . by stating that the Plaintiff . . . had a reputation of providing poor service"); *id.* ¶ 43 ("The Defendant's conduct of 'steering' customers away . . . from patronizing the Plaintiff . . . included: telling insureds that the

Plaintiff's shop had or has quality control issues, takes longer to finish than other shops, does not perform work that can be guaranteed by the insurer[.]").

So, in April 2023, the Plaintiff sued the Defendant in state court, asserting one count of breach of an implied contract (Count I) and one count of intentional tortious interference with a business relationship (Count II). *See* State Court Complaint [ECF No. 1-1]. The Defendant removed the action to federal court in June 2023. *See* Notice of Removal [ECF No. 1]. In July 2023, the Plaintiff filed the operative AC, maintaining the same two causes of action. In August 2023, the Defendant moved to dismiss that AC. *See* Motion to Dismiss (the "MTD") [ECF No. 27]. In January 2024, U.S. Magistrate Judge Jared M. Strauss issued a Report and Recommendation (the "R&R") [ECF No. 39], recommending that we dismiss only Count I. In March 2024, we adopted the R&R in its entirety and dismissed Count I. *See generally* Order on Motion to Dismiss [ECF No. 43].

In October 2024, the Defendant moved for summary judgment. In November 2024, the Plaintiff filed a Response in Opposition to the Motion (the "Response") [ECF No. 75]. And later that month, the Defendant filed a Reply in Support of the Motion (the "Reply") [ECF No. 77].

## THE LAW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And an issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ibid.* "All reasonable inferences must be drawn in favor of the nonmoving party, but a mere scintilla of evidence will not suffice to overcome a motion for summary judgment." *Ismael v. Roundtree*, 161 F.4th 752, 758–59 (11th Cir. 2025) (cleaned up); *see also Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990) ("When a motion for summary judgment has been made properly, the nonmoving party may not rely solely on the pleadings, but by

affidavits, depositions, answers to interrogatories, and admissions must show that there are specific facts demonstrating that there is a genuine issue for trial."). "The moving party has the burden of demonstrating that there are no genuine issues of material fact," but "[o]nce a summary judgment movant's initial burden is met, the burden shifts to the nonmoving party to bring the court's attention to evidence demonstrating a genuine issue for trial." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1335 (11th Cir. 2024) (cleaned up).

## ANALYSIS

The Defendant moves for summary judgment on two main grounds. *First*, it argues that the Plaintiff's tortious-interference theory fails as a matter of law because "Florida law recognizes a privilege to interfere with a business relationship of another by an interested party," and the "extremely limited" exceptions to that privilege don't apply here. MSJ at 17–18. *Second*, the Defendant contends that the SDUF "fails in three critical fashions": it "violates Local Rule 56.1(b)(1)'s requirement of 'specific, pinpoint references' to record materials and all four provisions of Local Rule 56.1(b)(2)"; it "fails to present the Court with admissible evidence preventing the entry of summary judgment"; and it is "simply wrong" in its recitation of Florida law. Reply at 3. We begin—and end—with the Defendant's substantive challenge.

"The elements of tortious interference with a contract or business relationship are: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 385 (Fla. Dist. Ct. App. 1999). "The third element, intentional and unjustified interference with a business relationship, requires the plaintiff to allege that the defendant acted without justification." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1280 (11th Cir. 2015) (quotation marks

omitted). "This is a fact-intensive inquiry that requires an examination of the defendant's conduct, its motive, and the interests it sought to advance." *Ibid.*

"For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship." *Al Rushaid Petroleum Inv. Co. v. Siemens Energy Inc.*, 159 F.4th 887, 894 (11th Cir. 2025) (Marcus, J.); *see also Heavener, Ogier Servs., Inc. v. R.W. Fla. Region, Inc.,* 418 So. 2d 1074, 1076–77 (Fla. Dist. Ct. App. 1982) ("If a defendant interferes with a contract in order to safeguard a preexisting economic interest of his own, the defendant's right to protect his own established economic interest outweighs the plaintiff's right to be free of interference, and his actions are usually recognized as privileged and nonactionable."). But "a non-stranger's conduct still may be actionable in a tortious interference claim in two situations: (1) if improper means are employed, or (2) if the motive for the actions is purely malicious and not coupled with any legitimate competitive economic interest." *Al Rushaid*, 159 F.4th at 895–96 (cleaned up). "Improper methods include physical violence, misrepresentations, illegal conduct, and threats of illegal conduct." *Shenzhen Kinwong Elec. Co. v. Kukreja*, 574 F. Supp. 3d 1191, 1214 (S.D. Fla. 2021) (Altman, J.) (cleaned up); *see also Hurchalla v. Lake Point Phase I, LLC*, 278 So. 3d 58, 66 (Fla. Dist. Ct. App. 2019) ("[A]llegations of the use of threats, intimidation, and conspiratorial conduct were indicative of malice" (quotation marks omitted)). And malice involves conduct "committed with ill will, hatred, spite, or an evil intent"—*i.e.*, "the subjective intent to do wrong." *Gay v. Jupiter Island Compound, LLC*, 358 So. 3d 780, 789–90 (Fla. Dist. Ct. App. 2023) (cleaned up); *see also Hurchalla*, 278 So. 3d at 66 ("[E]xpress malice is proven when the motive is characterized as out of spite, to do harm, or for some other bad motive." (quotation marks omitted)).

Our Plaintiff embraces both an improper-means and a pure-malice framework. It argues that the Defendant "acted inappropriately, improperly steering customers to a . . . cheaper repair station by misstating the facts about the Plaintiff's business[,] demonstrating malice, not a legitimate business

5

purpose." Resp. at 3. And the Plaintiff believes that it offers enough evidence of that theory—as to each of Kolander, Kon, and Cohen—to survive the MSJ. To that end, it points to three declarations: one from Robert Molina (hereafter "Robert"), the "owner and operator of CCX," *see* Robert Molina Declaration [ECF No. 76-1] at 2; one from Christina Molina (hereafter "Christina"), the "manager and Chief Operating Officer for CCX," *see* Christina Molina Declaration [ECF No. 76-2] at 2; and one from Sheila Valle, a CCX "Customer Service Representative . . . in the position of Manager," *see* Valle Declaration [ECF No. 76-3] at 2.[1] We consider each customer-specific argument in turn.

### a. The Kolenda Claim

We start with the evidence as to Kolenda, "whose 2022 Mercedes CL250 had been towed to CCX following an accident." Valle Declaration at 3. One of the Plaintiff's three declarations—the Christina Molina Declaration—makes *no* mention of Kolenda. For its part, the Robert Molina Declaration states that "State Farm provided false and misleading information to . . . Kolenda . . . in an effort to disparage the warranty provided by CCX" and "to steer Ms. Kolenda to move her vehicle

---

[1] One procedural point. Federal Rule of Civil Procedure 56 provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). But "[u]nsworn statements may not be considered by a district court in evaluating a motion for summary judgment." *Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022); *see also Carr v. Tatangelo*, 338 F.3d 1259, 1273 (11th Cir. 2003), *as amended* (Sept. 29, 2003) ("Only pleadings, depositions, answers to interrogatories, and admissions *on file,* together with *affidavits* can be considered by the district court in reviewing a summary judgment motion." (quotation marks omitted)). Still, "[a] statutory exception to this rule exists under 28 U.S.C. § 1746, which permits unsworn declarations to substitute for a sworn affidavit or sworn declaration for purposes of summary judgment if certain statutory requirements are met." *Roy*, 53 F.4th at 1347; *see also* 28 U.S.C. § 1746 (allowing a declaration executed within the United States to substitute for a sworn affidavit if the declarant signs, dates, and subscribes the document as true under penalty of perjury in substantially the following form: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.").

The parties here rely on *declarations*, not notarized affidavits. But each declaration complies with the dictates of § 1746. We can therefore consider this evidence in adjudicating the Motion. *See Scaff-Martinez v. Fed. Bureau of Prisons*, 160 F. App'x 955, 957 (11th Cir. 2005) ("Because the unsworn declaration was made under the penalty of perjury, there was no Rule 56[] violation.").

repairs from CCX . . . to another repair shop that State Farm indirectly controlled through its 'select service program.'" Robert Molina Declaration at 9. But to substantiate that testimony, the declaration adds only that the Plaintiff is "a Mercedes certified repair shop," that "[t]he alternate repair shop designated by State Farm . . . was not Mercedes certified," and that "[t]he repairs and restoration of Ms. Kolenda's vehicle at the non-Mercedes certified repair shop voided . . . [the] vehicle's warranty." *Ibid.*

The final declaration—the Valle Declaration—documents "conversations" between Valle and Kolenda's son, Aaron, "who was calling for and on behalf of his mother." *Id.* at 3. It notes that Valle had "three" conversations with Aaron "[b]etween July 25 and July 26, 2022," but offers no insight into the content of those talks and states only that Aaron "was in a hurry to get an estimate for the restoration of his mother's vehicle." *Ibid.* On July 26, 2022, Valle told Aaron that, "because his mother's vehicle had sustained damage to the suspension[,] the only way to generate an accurate estimate was to tear-down (or take off) the outer shell components so that hidden damage could be revealed." *Ibid.* In response, Aaron "stated that 'he does not have an issue with that but he would like to call S[tate] [ ] F[arm] first to confirm as he advised that they told him nothing else.'" *Ibid.* (ellipses omitted). On July 28, 2022, Valle notes that she participated in a "three-way call initiated by State Farm with [Aaron] on the line, during which call [Aaron] advised that his mother's vehicle was going to be towed to another repair shop because he had 'just learned' that CCX was 'shady.'" *Ibid.* To that end, Valle says, the "State Farm representative on the three-way call coordinated the removal by tow of the insured's vehicle from CCX to a repair center that has a contractual relationship with State Farm." *Id.* at 3–4.

Here's where that evidence leaves us. Christina omits any discussion of Kolenda. Robert claims the Defendant gave Kolenda "false and misleading information" to "disparage" the Plaintiff, but neglects to specify *any* such misinformation and instead points only to the fact that Kolenda's

7

Mercedes ended up in a repair shop that wasn't certified by Mercedes. And Valle says only that Kolenda's son wanted to confirm estimates with the Defendant, that Kolenda later informed Valle that he believed the Plaintiff was "shady," and that the Defendant coordinated the transfer of the Mercedes.

This evidence establishes neither improper means nor pure malice. The Robert Molina Declaration fails to set forth any concrete evidence of misinformation or disparagement, resorting instead to conclusory characterizations. And the law is well-settled that "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("For factual issues to be considered genuine, they must have a real basis in the record." (quotation marks omitted)).[2] Finally, the Valle Declaration never links Aaron's wariness to the Defendant. At best, it confirms a modest proposition: Aaron spoke with Valle without committing to using the Plaintiff, made clear that he wouldn't agree to anything without the Defendant's input, and didn't attribute his misgivings to the Defendant, which *didn't* unilaterally remove the Mercedes.

That picture fits with the Defendant's evidence. The Defendant offers testimony from Brenda Sales, a State Farm "Claim Specialist," who "sent" Kolenda a letter, which "advised of her right to select the repair facility of her choice," "acknowledged that Ms. Kolenda had selected Plaintiff," and

---

[2] To be sure, Robert lists examples of "false and disparaging comments" the Defendant allegedly made. *See, e.g.*, Robert Molina Declaration at 8 ("CCX has a reputation of providing poor service"; "CCX is not legally authorized to repair"; "CCX takes longer to finish a repair job than other repair shops in the area[.]" (cleaned up)). But he does so without specifying to whom, when, and by whom these statements were made and instead notes only that the Defendant made the comments "to its insured, including to Mr. Cohen, Mr. Kon *and/or* Ms. Kolenda[.]" *Ibid.* (emphasis added). "These vague references, without specific facts, are not enough to survive summary judgment," particularly given the evidence the Defendant has adduced. *Brown v. Learjet, Inc.*, 2025 WL 3724471, at *19 n.17 (S.D. Fla. Dec. 24, 2025) (Altman, J.); *see also Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value.").

"advised Ms. Kolenda that Plaintiff 'may charge more than what State Farm has determined is payable under the policy, and as such, she may be responsible for charges that exceed what is payable under the policy.'" Sales Declaration [ECF No. 69-3] at 1, 3. On July 27, 2022, Sales continues, "Aaron called me and informed me (a) Ms. Kolenda was 'adamant' her vehicle was not staying at Plaintiff; (b) Plaintiff was 'being shady'; (c) Plaintiff repeatedly attempted to 'push' Ms. Kolenda to leave her vehicle at Plaintiff's facility; and (d) Ms. Kolenda was going to have her vehicle picked up by State Farm and towed to another shop." *Id.* at 4 (cleaned up). Sales further affirms that "the decision to move Ms. Kolenda's vehicle was made by Ms. Kolenda," that "the only reason Ms. Kolenda was advised of potential out of pocket expenses was to reduce the risk of any misunderstanding if she chose a non-Select Service facility," and that "[a]t no time have I ever made a disparaging remark . . . about Plaintiff." *Id.* at 5; *see also ibid.* ("I never made any statement to any State Farm insured/claimant about Plaintiff's reputation, that it had quality control issues, that it took longer to finish repairs than other shops or any false or misleading statement of any kind to improperly interfere with any business relationship between Plaintiff's customers and Plaintiff."). To survive summary judgment, the Plaintiff had to meet this evidence head on and rebut it. *See Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("One who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial." (cleaned up)). As we've said, it's failed to do that.

Resisting this conclusion, the Plaintiff maintains that the Defendant engaged in improper means by "mispresent[ing] that the Plaintiff does not charge customary, reasonable, standard fees even though STATE FARM knows that the fees charged by the Plaintiff are standard in the industry." Resp. at 6; *see also id.* at 4 ("[T]he desire to undermine the Plaintiff's business . . . may be inferred by the repetitive conversations misrepresenting that the Plaintiff charges are not standard in the industry, that the customer will be responsible for extra charges not covered, even when the Defendant's

9

employees know this is not true."). But the Plaintiff doesn't offer proof of any *deliberate* misrepresentation. And, in any event, the argument finds no support in the record. Testimony from Justin Platt, a "Claim Team Manager . . . manag[ing] a team of State Farm Claim Specialists," establishes that "State Farm's insurance policies provide that State Farm may choose one of three methods to determine the cost to repair a covered vehicle." Platt Declaration [ECF No. 69-1] at 2. Those three methods consist of: *one*, "[t]he cost agreed to by both the owner of the covered vehicle and [the Defendant]"; *two*, "[a] bid or repair estimate approved by [the Defendant]"; or *three*, "[a] repair estimate that is written based upon or adjusted to . . . the prevailing competitive price," "the lower of paintless dent repair pricing established by an agreement [the Defendant] ha[s] with a third party or the paintless dent repair price that is competitive [in] the market," *or* "a combination of . . . [the] above." Exhibit A to Platt Declaration [ECF No. 69-1] at 1.

The Kolenda argument thus falls short. "Florida courts have explained that . . . [a] defendant's interference to protect its economic interests is privileged unless the plaintiff alleges a purely malicious motive divorced from any legitimate competitive economic interest." *Duty Free Americas*, 797 F.3d at 1280 (quotation marks omitted); *see also Sec. Title Guarantee Corp. of Baltimore v. McDill Columbus Corp.*, 543 So. 2d 852, 855 (Fla. Dist. Ct. App. 1989) ("The unchallengable controlling principle is that so long as improper means are not employed, activities taken to safeguard or promote one's own financial interests are entirely non-actionable." (cleaned up)). But the Plaintiff cannot demonstrate—and in fact never argues—that the Defendant acted *only* with malice. *See Glob. Marine Expl., Inc. v. Republic of France*, 151 F.4th 1296, 1313 (11th Cir. 2025) ("It is irrelevant whether the person who takes authorized steps to protect his own economic interests does so while also harboring some personal malice or ill-will towards the plaintiff." (cleaned up)); *see also Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("A party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed. Also, when a party fails to respond to an argument or otherwise address

10

a claim, the Court deems such argument or claim abandoned." (cleaned up)). Nor can the Plaintiff show that the Defendant misrepresented its contractual obligations, given the unrebutted evidence that the contract allowed the Defendant to insure only Select-Service costs. The record thus leaves no disputed material facts as to Kolenda.

### b.  The Kon Claim

The Plaintiff's arguments about Kon fare no better. Of the Plaintiff's three declarations, only Robert even mentions Kon, whose "Tesla Model 3 . . . was towed into CCX for repairs" on "November 30, 2022." Robert Molina Declaration at 5. On "December 7, 2022," according to that declaration, "Mr. Kon called and spoke with [CCX's] general manager, explaining that State Farm had requested that he contact CCX and request for CCX to lower its labor rate from $115/hour to $51/hour." *Ibid.* The Plaintiff "explained to Mr. Kon that the standard CCX labor rate of $115/hour was both customary and reasonable for Tesla certified collision centers" and requested "direct contact with his State Farm adjuster . . . [to] discuss, directly with State Farm, the labor rate discount being requested by State Farm." *Ibid.* On "December 7th and December 8th," "State Farm representatives contacted CCX" and "advis[ed] that the maximum labor rate State Farm would pay on restoration . . . was $51/hour." *Id.* at 6. The Plaintiff responded that it "had recently completed approved work on State Farm insured vehicles, receiving payment for labor billed at $115/hour," that "the current labor rate of $115/hour was customary and reasonable among the 25+ Tesla certified repair shops within a 100-mile radius," and that the "below-market rate contractually negotiated by State Farm" with a different repair shop—"Sawgrass Collision," a Select Service facility—"was not reasonable." *Ibid.* Still, the Plaintiff "advised" the Defendant that it'd "accept an 'average' labor rate for the Tesla repair shops in Broward County," but "that option was rejected[.]" *Ibid.*

On those facts, Robert concludes that the Defendant "made materially false and misleading statements to Mr. Kon about its obligations under their policy of insurance to pay the customary and

reasonable charges for the restoration of his Tesla by CCX, including disparaging CCX and interfering with the customer relationship." *Ibid.* Specifically, Robert says that the Defendant "arbitrarily represent[ed] to Mr. Kon" that "the $115 hourly labor rate charged by CCX was excessive," that "CCX was 'known for overcharging,'" and that "the customary and reasonable labor rate in the marketplace was at or below $51/hour." *Id.* at 7; *see also ibid.* ("To accomplish their objective to steer business away from CCX, State Farm advised Mr. Kon that, and in total disregard of their policy requirements for claim coverage and obligation to pay the customary and reasonable charges for the restoration of his Tesla, if he wanted to have his Tesla repaired at CCX then State Farm would only pay the first $51/hour for labor and that Mr. Kon would be personally liable to pay for all labor costs over $51/hour; or, in the alternative, Mr. Kon could agree with their offer to move his Tesla to Sawgrass Collision where State Farm has a pre-negotiated arrangement for that shop to only bill SF Insureds at $51/hour.").

That theory suffers from the flaws we discussed above. For one, the misrepresentation accusation disregards the uncontested evidence that the Defendant *wasn't* contractually obligated to insure any charge considered customary. And telling Kon that CCX overcharges and that a reasonable rate would be closer to $51/hour cannot alone support a tortious-interference claim.[3] Those statements don't read as *purely* malicious, given the nature of the Defendant's relationship with Kon and the fact that (as the Plaintiff acknowledges) the Defendant *had* "negotiated a . . . rate of $51/hour with . . . Sawgrass Collision." Robert Molina Declaration at 2; *see also Palm Beach Cnty. Health Care Dist.*

---

[3] The Plaintiff at times refrains from directly accusing the Defendant of disparaging its reputation. Instead of claiming that the Defendant told the customers that the Plaintiff is "shady," for instance, the Plaintiff argues that the Defendant "allowed the customers to perceive the Plaintiff as 'shady,' or that the Plaintiff 'over charged,' or provided services that were not covered by the policy[.]" Resp. at 4. That ambivalence further underscores the tortious-interference claim's shortcomings because the Plaintiff fails to cite any authority for a defendant's independent obligation to preemptively debunk customer misconceptions about third-party businesses.

*v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. Dist. Ct. App. 2009) ("Under Florida law, a defendant is not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed."); *Gunder's Auto Ctr. v. State Farm Mut. Auto. Ins. Co.*, 422 F. App'x 819, 822 (11th Cir. 2011) ("Because State Farm is obligated to indemnify its insureds for repair work done on its insureds' cars, State Farm is no stranger to the business relationship between Gunder's and customers who are insured by State Farm.").

Nor do those statements read as *improper*. "Ultimately, to determine whether interference is justified or privileged requires a commonsense consideration of whether the conduct was 'sanctioned by the rules of the game' and what is 'right and just' under the circumstances." *Bluesky Greenland Env't Sols., LLC v. 21st Century Planet Fund, LLC*, 985 F. Supp. 2d 1356, 1367 (S.D. Fla. 2013) (Hurley, J.). And we fail to see how a statement by the Defendant that the Plaintiff overcharges customers rises to the level of unlawful—and thus improper—conduct. *See Ellis Rubin, P.A. v. Alarcon*, 892 So. 2d 501, 503 (Fla. Dist. Ct. App. 2004) ("What the parties may not do, however, is engage in intentional and unjustified interference by engaging in fraud or collusion."). That's especially true in context, given that the Defendant *does* service CCX customers, *see* Joint Statement at 2 ("Plaintiff continued to provide vehicle repair services to . . . customers . . . insured by State Farm."); Resp. at 4 ("Plaintiff admits State Farm continues to do business with Plaintiff. Continuing to do business with Plaintiff is the direct anthesis of malicious conduct." (citations omitted)), and that the Plaintiff *itself* criticizes the Defendant's rates, *see* Robert Molina Declaration at 6 (insisting that the "below-market rate contractually negotiated by State Farm" with Sawgrass Collision "was not reasonable").

Compare the Plaintiff's evidence with the Defendant's. Testimony from Eric Dutile, a State Farm "Claim Team Manager," attests that, on "December 6, 2022," Kon told Dutile that, if the Plaintiff didn't "agree to accept State Farm rates," he "might move his vehicle to a Tesla certified

Select Service[.]" Dutile Declaration [ECF No. 69-2] at 2. On "December 7, 2022," the declaration continues, Dutile "received a call from Mr. Kon who advised he spoke with Plaintiff and was told Plaintiff would not agree to State Farm rates." *Ibid.* Dutile then spoke with "Chris" at CCX, who "confirmed" the request for "$115 per hour." *Ibid.* In response, Dutile "advised 'Chris' that State Farm would pay $51 per hour, not the $115 per hour requested." *Ibid.* That same day, Dutile informed Kon that the Plaintiff "would charge $115 per hour," that "he was free to select any shop he desired," and that "Sawgrass Ford" was a Tesla-certified and Select Service facility. *Ibid.* On December 8, 2022, Dutile "advised" Kon that the Defendant "would pay the cost to move his vehicle to another facility, but State Farm needed to know what his decision was on the matter." *Ibid.* Kon responded that "he did not want to move his vehicle and did not feel he should have to pay anything . . . out of pocket," but Dutiles explained that Kon "would be responsible for any charges not approved by State Farm if the vehicle stayed at Plaintiff." *Ibid.* On December 8, 2022, "Kon's agent's office" told Dutile that "Mr. Kon agreed to have Sawgrass Ford . . . perform the repairs." *Ibid.* Dutiles further affirms that "[a]t no time did I direct Mr. Kon to use another repair facility" or "ma[k]e a disparaging remark to any State Farm insured/claimant about Plaintiff[.]" *Ibid.*; *see also ibid.* ("I never made any statement to any State Farm insured/claimant about Plaintiff's reputation, that it had quality control issues, that it took longer to finish repairs than other shops, nor did I make any false or misleading statement of any kind to improperly interfere with any business relationship between Plaintiff's customers and Plaintiff.").

Given all this, we see no genuine dispute of a material fact concerning Kon. There's no evidence of (or argument for) pure malice. *See Nodar v. Galbreath*, 462 So. 2d 803, 811 (Fla. 1984) ("Where a person speaks upon a privileged occasion, but the speaker is motivated more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege, then it can be said that there was express malice and the privilege is destroyed. Strong,

14

angry, or intemperate words do not alone show express malice; rather, there must be a showing that the speaker used his privileged position to gratify his malevolence." (quotation marks omitted)); *Coogler v. Rhodes*, 21 So. 109, 112 (Fla. 1897) ("While the malice may be inferred from the communication, it is not inferable from the mere fact that the statements are untrue."). And there's no evidence of improper means. *See Weisman v. S. Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 651 (Fla. Dist. Ct. App. 2020) (explaining that, once the defendant "show[s] improper means were not employed," the "burden . . . then shifts to the party that brought the tortious interference claim to show improper means were employed"); *see also Gunder's Auto Ctr.*, 422 F. App'x at 822–23 (finding that statements "State Farm made to its insureds about the costs, quality, and timeliness" of an automobile repair shop "fail to show the improper means needed to defeat State Farm's privilege against a tortious-interference claim"). The Plaintiff thus cannot survive summary judgment as to Kon.

### c.  The Cohen Claim

We turn finally to Cohen, whose "Tesla Model S . . . was towed into CCX for repairs" on "June 7, 2022." Christina Molina Declaration at 2. On "June 10, 2022," Christina explains, "a wheel-lift tow truck backed up onto the CCX property, towards Mr. Cohen's Tesla, lowered his wheel-lift and hooked the back wheels of Mr. Cohen's Tesla." *Id.* at 3; *see also ibid.* ("I thought that Mr. Cohen's Tesla was being stolen. Along with several other CCX staff members, I ran outside to confront the tow truck driver."). According to her declaration, "the tow truck driver claimed he had been sent by the vehicle owner to pick up the Tesla," but "admitted" after being "pressed for more details" that "he didn't even know the name of the vehicle owner" and that he "had no written authorization from Mr. Cohen, the vehicle owner." *Ibid.* When Christina "contacted Mr. Cohen by phone," Cohen "was distraught upon learning his Tesla had been towed off CCX's property" and "stated that he had not authorized his Tesla to be removed, and he had no knowledge of what was going on." *Ibid.* Christina then filed a report with the Broward Sheriff's Office, and the "tow truck driver provided to the

responding Broward Sheriff's officer an electronic copy of the tow-order showing the order was initiated by State Farm and directing the removal of his Tesla from CCX." *Id.* at 4. "On June 11th, Mr. Cohen came to CCX and . . . advised that the decision to remove his Tesla from CCX on June 10th [ ] had been made by State Farm and without his prior knowledge." *Ibid.*; *see also id.* at 5 ("State Farm forcibly removed Mr. Cohen's Tesla from CCX, without the vehicle owner's prior knowledge or consent, written or verbal, to steer the work to Sawgrass Collision.").

That evidence (it's true) conflicts with testimony the Defendant has marshalled. *See, e.g.*, Riles Declaration [ECF No. 71-1] at 3 ("[T]he decision to move Mr. Cohen's vehicle to another facility was made by Mr. Cohen because he did not want to risk incurring out of pocket expenses."). But, at summary judgment, "the court's function is not to weigh the evidence." *United States v. Stein*, 881 F.3d 853, 858 (11th Cir. 2018) (quotation marks omitted); *see also ibid.* ("Nor does Rule 56 require that an otherwise admissible affidavit be corroborated by independent evidence."). Even "[m]aking credibility choices between competing views of the evidence is inappropriate in summary judgment proceedings." *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir. 1987). "Rather, on summary judgment, the district court must accept as fact all allegations the non-moving party makes, provided they are sufficiently supported by evidence of record." *Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020).

The evidence here suggests that the Defendant—without authorization and relying on deception—seized Cohen's Tesla from the Plaintiff's custody and brought it to its preferred shop. This action, if true, *could* prove "sufficiently egregious" as to constitute improper means. *Making Ends Meet, Inc. v. Cusick*, 719 So. 2d 926, 928 (Fla. Dist. Ct. App. 1998); *see also KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004) (noting that "illegal conduct" qualifies as an improper method); *Hurchalla*, 278 So. 3d at 67 ("Fraudulent misrepresentations are ordinarily a wrongful means of interference and make an interference improper." (cleaned up)); *McCurdy v. Collis*, 508 So. 2d 380,

384 (Fla. Dist. Ct. App. 1987) ("[T]he privilege does not encompass the purposeful causing of a breach of contract."). And that means a jury *could* find that the Defendant tortiously interfered with the Plaintiff's business relationship with Cohen.

That evidence might fall flat at trial. But "when competing narratives emerge on key events" at summary judgment, "courts are not at liberty to pick which side they think is more credible." *Sconiers*, 946 F.3d at 1263; *see also Stein*, 881 F.3d at 857 ("[N]othing in Rule 56 (or, for that matter, in the Federal Rules of Civil Procedure) prohibits an affidavit from being self-serving. Indeed, as the Seventh Circuit observed, most affidavits submitted in response to a summary judgment motion are self-serving." (cleaned up)). For now, then, the Plaintiff has presented sufficient evidence to counter the Defendant's theory of Cohen's case. We thus cannot award summary judgment as to this aspect of the dispute.[4]

---

[4] The Defendant advances two counterarguments—both unpersuasive.

*First*, it contends that the Plaintiff is "unable to prove any damages" because its "expert must be excluded." MSJ at 19. But that argument appears to rest on the Motion to Preclude Julio Plutt Testimony [ECF No. 66], which the Defendant has since withdrawn, *see* Notice of Withdrawal [ECF No. 83]. In any event, the Defendant's sparse discussion of damages cannot alone carry the day. *See N.L.R.B. v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.").

*Second*, as we noted earlier, the Defendant points to the Plaintiff's failure to comply with Local Rule 56.1. We agree that the Plaintiff's imprecision required that we "ferret through . . . declarations to . . . discern the evidence upon which [the] Plaintiff relies." *Id.* at 5; *but see United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Inelegance aside, however, the SDUF did enough to identify the facts the Plaintiff is challenging. And, even if it hadn't, we'd still be left with the "functional analog of an unopposed motion for summary judgment," because a violation of Local Rule 56.1 "does not . . . automatically entitle the movant to summary judgment." *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008); *see also United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami*, 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion."). We'll thus excuse any procedural errors by exercising our "inherent authority to manage [our] docket and enforce the local rules." *McNair v. Johnson*, 143 F.4th 1301, 1308 (11th Cir. 2025); *see also Reese*, 527 F.3d at 1270 (finding that the district court had the "broad discretion" to "overlook . . . noncompliance with Local Rule 56.1"). And, for those same reasons, we'll **DENY as moot** the Motion to Strike [ECF No. 79].

\* \* \*

In short, there remains one genuine dispute over a material fact. As to Kolenda and Kon, the Plaintiff relies on conclusory accusations that the Defendant disparaged the Plaintiff and mispresented the relevant contractual duties. Because those accusations lack evidentiary support and fail to rebut the Defendant's evidence, we cannot envision a reasonable jury ruling for the Plaintiff as to the Kolenda or Kon claims. As to Cohen, however, the Plaintiff has produced evidence that the Defendant orchestrated an unsanctioned (and potentially illegal) scheme to siphon business from the Plaintiff. And that evidence creates a genuine dispute of material fact and is thus sufficient to withstand summary judgment.

### CONCLUSION

Accordingly, we **ORDER and ADJUDGE** as follows:

1. The Defendant's Motion for Summary Judgment [ECF No. 67] is **GRANTED in part** and **DENIED in part**.

    a. The Motion is **GRANTED** as to the claims concerning Kolenda and Kon.

    b. The Motion is **DENIED** as to the claims concerning Cohen.

2. The Defendant's Motion to Strike [ECF No. 79] is **DENIED as moot**.

3. A new trial order, setting future deadlines, is forthcoming.

**DONE AND ORDERED** in the Southern District of Florida on April 22, 2026.

18

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record